**HAMPTON & ROYCE, L.C.**
**119 West Iron Avenue, Ninth Floor**
**P. O. Box 1247**
**Salina, Kansas 67402-1247**
**(785) 827-7251 - Telephone**
**(785) 827-2815 - Facsimile**
**www.hamptonlaw.com**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CAROL A. KELLOGG, Individually, and<br>as sole Heir-at-Law and Administrator<br>of the Estate of Lee J. Witschi, deceased<br><br>Plaintiff,<br><br>v.<br><br>GOOD SAMARITAN SOCIETY, INC.<br>a/k/a THE EVANGELICAL LUTHERAN<br>GOOD SAMARITAN SOCIETY,<br>GOOD SAMARITAN SOCIETY –<br>MINNEAPOLIS, KANSAS and<br>CITY OF MINNEAPOLIS, KANSAS;<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

## **COMPLAINT**

Plaintiff Carol A. Kellogg, Individually and in her capacity as sole Heir-At-Law and Administrator of the Estate of her late father, Lee J. Witschi, deceased, [hereinafter "Decedent"] by and through her attorneys of record, Debra Egli James and Brian W. Wood of Hampton & Royce, L.C., files her Complaint against Defendants Good Samaritan Society, Inc. a/k/a The Evangelical Lutheran Good Samaritan Society [hereinafter "Good Samaritan Society"], Good Samaritan Society – Minneapolis, Kansas [hereinafter "Good Samaritan Minneapolis" or "the Facility"] [hereinafter collectively "Corporate Defendants"]; and City of Minneapolis, Kansas [hereinafter "Defendant City"] stating and alleging as follows:

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 2

## I.   JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over Kellogg's claims against the Defendant

City under 28 U.S.C. §§1331 and 1343(3) as the controversy arises under the United States

Constitution and under 28 U.S.C. §1983 because it involves a deprivation of rights, privileges or

immunities secured by the Constitution under color of a statute, ordinance, regulation, custom or

usage of any state.  With respect to these claims, the Court has authority to award attorney fees under

42 U.S.C. §1988(b) and expert witness fees as a part of attorney fees under 42 U.S.C. §1988(c).

Plaintiff further invokes the supplemental jurisdiction of the Court under 28 U.S.C. §§2201 and 2202

to hear and adjudicate state law claims against the Defendant City.

2.      Each, and collectively all, of the acts or threats of action by the Defendant City and

its employees and agents against the Decedent, as alleged herein, were performed under color and

pretense of the statutes, ordinances, regulations, customs and usages of the State of Kansas.

3.      The claims against the Good Samaritan Society and Good Samaritan Minneapolis

[collectively "Corporate Defendants"] arise under the Kansas Unfair Trade and Consumer Protection

Act, *K.S.A. §50-617 et. seq.* [hereinafter "KUTCPA"], the Kansas Wrongful Death Act, *K.S.A.  §60-*

*1901, et. seq.*, violations of state and federal law governing nursing homes and the care provided to

nursing home residents, which establish clear and unequivocal standards of care, and the common

law, including but not limited to medical malpractice, and other causes of action for injury to a

person that survive death under statutes governing survival and abatement of actions found at *K.S.A.*

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 3

*§60-1801, et. seq.*.  Plaintiff invokes the supplemental jurisdiction of the Court under 28 U.S.C.

§§2201 and 2202 to hear and adjudicate these state law claims against the Corporate Defendants.

4.      Venue is proper in this District under 28 U.S.C. §§1391(b)(1) and 1391(c)(2) because

all of the Defendants are entities with the capacity to sue in their common names under applicable

law and are residents of this judicial district, where they are subject to the Court's personal

jurisdiction with respect to the causes of action described in this Complaint.  Venue is also proper

in this district under 28 U.S.C. §1391(b)(2) because all or a substantial part of the events or

omissions giving rise to the claims described in this Complaint occurred in this District.

## II.      COMPLIANCE WITH REQUIREMENTS OF K.S.A. §12-105b

5.      Plaintiff Carol A. Kellogg [hereinafter "Kellogg"] has fully complied with the

requirements and conditions precedent described in all applicable laws and statutes in order to file

this Complaint, which include but are not limited to the requirements of K.S.A. §12-105b for the

presentation of claims which could give rise to an action under the Kansas Tort Claims Act,

including but not limited to notice, content, limitations on commencement of the action, and the

timely filing of the Complaint.

## III.      THE PARTIES

6.      Kellogg is a natural person who resides, and has at all times relevant to the events

described in the Complaint resided, in Salina, Saline County, Kansas.  Kellogg is the daughter and

only living heir-at-law of Lee J. Witschi, deceased.

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 4

7.      Lee Witschi died on May 19, 2016 at Good Samaritan Minneapolis. For many years before his retirement, Lee ran his own business, which he operated from his home in Salina, called Good House Keeping Appliance Service. He also served as a Bishop of the Church of Jesus Christ of Latter Day Saints.

8.      Kellogg was appointed Administrator of her late father's Estate under Letters of Administration issued by Saline County District Court Judge Paul Hickman on or about March 6, 2017, in Case No. 2017-PR-000019-DE, captioned *In the Matter of the Estate of Lee J. Witschi, Deceased.*

9.      The Defendant City is a municipal corporation as defined by K.S.A. §12-105a(a) and K.S. A. §75-6102(b) and is organized under the laws and the Constitution of the State of Kansas. It is a entity capable of suing and being sued.

10.     The Defendant City maintains, funds, and operates the Minneapolis Police Department. The Department's officers work in the Minneapolis, Kansas community to enforce the law, respond to emergencies, calls for assistance, crime scenes, accidents, and other incidents, and are required to conduct themselves in accordance with established laws, regulations, protocols, policies, and standards of care, among other duties.

11.     Defendant Good Samaritan Society is the largest non-profit provider of senior care and services in the United States. Headquartered in Sioux Falls, South Dakota, it operates senior care facilities throughout the United States. Upon information and belief, it currently operates

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 5

twenty-nine (29) senior care centers in Kansas.  Some are skilled nursing facilities.   Others are assisted living facilities, and some involve home health care operations.

12.      Defendant Good Samaritan Minneapolis is, and was at all times relevant to the events described herein, a skilled nursing facility owned and operated by the Corporate Defendants and located at 815 North Rothsay Avenue, Minneapolis, Kansas.  It was licensed to operate, and did at all times pertinent to the events described in this Complaint operate, a 24-hour-a-day, sixty-four bed facility, seven days a week, for residents who, due to functional impairments, needed skilled nursing care and special mental health services to compensate for activities of daily living limitations.

13.      The late Lee Witschi was a resident of Good Samaritan Minneapolis from November 12, 2013, when he was admitted as a resident, until his death on May 19, 2016.

## IV.  STATEMENT OF FACTS AND CLAIMS AGAINST CORPORATE DEFENDANTS

14.      Witschi was eighty-nine (89) years old (D.O.B. September 25, 1924) when he was admitted to Good Samaritan Minneapolis as a patient/resident.

15.      His admission followed a four-day hospitalization at Salina Regional Health Center [hereinafter "SRHC"] in Salina, Kansas between November 8, 2013 and November 8, 2013. Witschi was hospitalized at SRHC for an evaluation of behavioral changes, memory loss, and other symptoms of possible dementia that Kellogg had gradually begun to notice in her father, which caused her to become concerned about his ability to continue to live independently.

16.      At the time of his admission to the hospital, Witschi had not been seen by a physician

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 6

in more than thirty (30) years because he had not needed one.  Other than his confusion, slightly

elevated blood pressure, and some mild acid reflux disease, Witschi was remarkably healthy.

17.     Following a full neurological work-up performed by Dr. Trent Davis, a Salina

neurologist, Witschi was diagnosed with "slowly progressive senile dementia" of likely Alzheimer's

type or "other behavioral dementia known to have behavioral disturbances as a feature of the

disease."  Davis made note that, in his interactions with Witschi, he found him to be "a very caring

and sincere person who finds good in almost everyone."

18.     Davis also noted that Witschi remained active and that his patient's primary concern

about living in a skilled nursing facility or somewhere other than his own home was that, if others

prepared his meals and otherwise took care of him, he might "get lazy and would not have enough

[to do] to keep himself busy during the day."  Davis commented that Witschi would have to be

persuaded that he had "earned the right to move to a place where he could enjoy the perks of his hard

work and that there would be plenty of physical activity to keep him engaged."

19.     A care plan was developed for nursing home placement that would allow Witschi to

transition directly from SRHC to Good Samaritan Minneapolis.  Arrangements were made for the

performance of an admission assessment by Good Samaritan Minneapolis personnel, which was

performed by the Facility's employees and agents, Ruth Copple and Pam Black, on November 12,

2013 at SRHC.

20.     At the time of Witschi's assessment, Black was the Director of the nursing facility

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 7

known as Good Samaritan Minneapolis, and Copple was responsible for social services within the

Facility.  Both Black and Copple were authorized by the Corporate Defendants, and presumably

properly trained and qualified, to make admission assessments for prospective patients/residents on

behalf of said Defendants.

21.     Following the admission assessment conducted by Black and Copple, Witschi was

accepted as a Good Samaritan patient/resident as soon as he "finalize[d]" the selection of a doctor

and was seen by that doctor, which was accomplished on the same date.

22.     Witschi's doctor described Witschi as very healthy, grossly oriented to person, place

and time; hard of hearing and easily confused.  He prescribed for him Namenda, a prescription drug

often used with Alzheimer's patients that had been recommended by Dr. Davis and continued his

prescription for Aricept, which was initially prescribed by Davis during Witschi's hospitalization

at SRHC between November 8 and November 12, 2013.

23.     Witschi was, thereafter and on the same date, admitted to and became a resident of

Good Samaritan Minneapolis, and was transported to the facility by Kellogg and her husband,

Wendell Kellogg, who had accompanied him to the doctor as well.

**A.      Kansas Unfair Trade and Consumer Practices Act, *K.S.A. §50-623, et. seq.***

24.     At all times material to the allegations described in this Complaint, the Corporate

Defendants offered, and Good Samaritan Minneapolis provided, skilled nursing care services within

the meaning of K.S.A. §39-923(a)(11) in Minneapolis, Kansas to persons suffering from dementia

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 8

in this special, personalized-care, memory care unit, known as "The Cove."

25.      The Corporate Defendants represented to the public that "The Cove" provided "care

that knows no boundaries" and included "more than having around-the-clock assistance available

[but also] . . . programs that attend to the mind, body and spirit with love and compassion."

www.goodsam.com/locations/minneapolis.   These Defendants also represented to the public that

its senior housing and services were "rooted in God's love" and that everything from the caring staff

to the specialized programs it offered had been created "to meet the needs of each person we serve."

26.      During the same time period, both prospective patients and patients of the Corporate

Defendants who suffered from dementia and their families were promised that said nursing facility

provided and would provide the "the highest quality care possible," which they were told would be

delivered by "consistent and specially trained staff" through "individualized care plans" and "24-

hour-a-day assistance" with "spiritual and cognitive enrichment" to help patients "get the get the

most out of life."

27.      The Corporate Defendants also promised prospective patients and patients and their

families, among other things, that their staff was specially trained to provide support and encourage

meaningful activities and interactions for, and effective communications with, its memory care and

other special needs residents. *Id.*

28.      The Corporate Defendants' website also touted that its "[p]rimary care staffing allows

genuine relationships to build allowing an increased level of care and deep awareness of each

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 9

resident's needs."

29.     These and other representations were relied upon by Plaintiff as part of the decision-making process that went into her father's placement with Good Samaritan Minneapolis in mid November, 2013.

30.     The representations described in Paragraphs 25-27 above were materially false and misleading and were deceptive acts and practices in violation of the Kansas Unfair Trade and Consumer Protection Act, *K.S.A. 50-623, et. seq.* because the representations were made by the Corporate Defendants to the public, including patients, prospective patients and their families, knowingly or with reason to know: (a) that the services and care offered to patients and prospective were not of the quality, benefit, or grade represented; and (b) that the services and care offered had uses and characteristics that Good Samaritan had no reasonable basis to claim or continue to claim.

31.     The use and continued use of these representations both before and throughout the time Witschi resided at Good Samaritan Minneapolis reveals the Corporate Defendants willful use of exaggeration, falsehood, and the willful concealment, suppression, or omission of material facts, in violation of the KUTCPA.

32.     Kellogg reasonably relied upon these representations to the detriment of Witschi and herself, and each were injured and damaged as a result.

**B.      Medical Malpractice and Other Negligence by the Corporate Defendants**

33.     While a resident of Good Samaritan Minneapolis, Mr. Witschi was provided services,

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 10

medical care, and treatment through medical providers and other employees/servants/agents/staff of the Corporate Defendants, and these individuals, whose names, identities and specific involvement are not fully known, were at all times acting within the scope and course of their employment with Good Samaritan Minneapolis while rendering such services, care and treatment to Witschi.

34.    In rendering these services and care to Witcshi, said Defendants, through their employees/servants/agents/staff, and as operators of a Kansas nursing facility (as defined at K.S.A. §39-923(a)(2)) had a ongoing duty to satisfy the requirements of the Adult Care Home Licensure Act, *K.S.A. §39-923, et. seq* [hereinafter "ACHLA"] in providing care to patients/residents.

35.    The express purpose of the ACHLA was enacted to develop, establish and enforce minimum standards for the care, treatment, health, safety, welfare and comfort of individuals living in adult care homes licensed by the Kansas Secretary of Aging and Disability Services.

36.    At all times relevant to the allegations described in this Complaint, the Corporate Defendants also had a duty to comply with federal law governing nursing facilities and were subject to federal regulations governing quality of care standards for such facilities promulgated under *The Nursing Home Reform Act* [hereinafter "NHRA"] at 42 C.F.R. §483, *Quality of Care,* which mandated, among other things:

    (a)    Sufficient nursing staff to adequately provide for all patients' needs (42 C.F.R. §483.30);

    (b)    Comprehensive and accurate assessments of each patient's functional capacity (42 C.F.R. §483.20) and regular updates of these assessments to reflect changes in each patient's physical, mental, and psycho-social

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 11

condition;

(c)     Development of a comprehensive plan of care to prevent the loss of a patient's ability to perform activities of daily living and to provide appropriate treatment and services to maintain and improve those abilities (42 C.F.R. §483.20) as well as to regularly update each patient's plan of care to ensure the treatment and services are provided in such a manner as to maintain and improve the patient's abilities;

(d)     Provide, when patients are unable to carry out activities of daily living, the necessary services to maintain good nutrition in order to maintain consistent, acceptable parameters of nutritional health (42 C.F.R. §483.25);

(e)     Ensure each patient receives adequate supervision and assistive devices to prevent accidents and injuries consistent with the patient's abilities and limitations (42 C.F.R. §483.25);

(f)     Ensure each patient enjoys freedom from significant medical errors impacting and/or affecting the patient's physical, mental, and psycho-social well being (42 C.F.R. §483.25); and

(h)     Promote each patient's quality of life and maintain the dignity and respect to which each patient is entitled (42 C.F.R. §483.15).

37.     The Corporate Defendants violated both the law and their duties to Mr. Witschi by failing to meet the standard of care required of them through violations of the requirements described in Paragraphs 33 and 34 above in Witschi's care and treatment.   Specifically, the Corporate Defendants failed to provide sufficient, properly trained and fully equipped nursing staff to meet Witschi's needs; failed to provide comprehensive, timely and accurate assessments of Witschi's capacities or to update that assessments with appropriate changes; failed to provide an adequate or comprehensive plan of care in order to insure that the treatment and services he received were

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 12

appropriate and meeting his needs; failed to provide adequate nutrition to maintain acceptable

parameters of health ; failed to provide adequate supervision and assistance to prevent injuries and

protect Witschi's physical and mental well-being; failed to protect Witschi from medical and

medication errors and physical assault and battery by others within and from outside the Facility; and

failed to protect his quality of life and dignity.

38.     Stated otherwise, compliance with acceptable standards of medical care for nursing

facilities for the Corporate Defendants and, frankly, all providers of skilled nursing care, hinges

upon, among other things, the simultaneous presence of:

(a)    an adequate number of nursing personnel including registered nurses, licensed practical nurses, and aides of various types;

(b)    quality, patient-appropriate food, drink, supplies, and mediation in adequate amounts;

(c)    competent nursing staff who have been properly and formerly screened and monitored in order to eliminate unfit potential and current employees;

(d)    adequately trained personnel who are regularly monitored and evaluated and whose assigned duties are consistent with their demonstrated level of competency;

(e)    regular and consistent planning at the facility level to assure that each resident has an individualized care plan that addresses each problem and is updated when the resident's condition changes in order to ensure competent, patient-directed care;

(f)    adequate and well-designed policies and procedures that assure personal care is provided on a uniform and uninterrupted basis to each resident in accordance with his or her needs;

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 13

(g)   adequate supervision and monitoring of nursing personnel to assure that the health care plan, physician's orders and policies/procedures have been implemented/complied with; and

(h)   adequate assessment and evaluation of each resident on a frequent basis to assure that changes in condition are addressed on a timely basis and that both inside and outside health care providers (i.e. attending physicians) are fully notified of significant changes of each patient's condition on a timely basis in order that plans of care can be amended and altered as necessary.

39.   It also requires "top-down," consistent, quality-driven oversight within the corporate structure to ensure that those entrusted with leadership positions in local facilities have the knowledge base, skill set, and resources necessary to put together, direct, and maintain a team of professions who have the ability, time, and support they need to protect the lives, safety and well-being of those unable to protect or care for themselves in accordance with established standards of medical care.  This absolutely requires adequate, consistent, corporate-wide supervision and training of local Administrators, Directors, Directors of Nursing, and other management employees.

40.   Unfortunately, the Corporate Defendants allowed repeated violations of applicable standards of medical and nursing facility care by failing to provide to insure that they, and those they employed, met the obligations outlined in Paragraphs 38 and 39 in connection with their care of Mr. Witschi and in failing to properly hire, train, oversee, direct, and maintain a team of professionals with the resources they needed to properly care for him.

41.   The failure of the Corporate Defendants to honor their duties to Lee Witschi and Kellogg as described in Paragraphs 38-40 above and directly and proximately caused both to incur

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 14

injury, damage, and loss, which would not otherwise have occurred.

42.     In addition  to the foregoing and to the personal detriment, injury, and loss of both Witschi and Kellogg, the Corporate Defendants failed to develop, implement and enforce written policies and procedures sufficient to prohibit and prevent abuse, neglect, and exploitation of residents and to ensure reporting of crimes that occurred at Good Samaritan Minneapolis.

43.     As a direct and proximate result of these acts and omissions, Witschi was abused, neglected, assaulted, and battered while a resident in the Facility, and crimes were committed against him by others that were not prevented, as they could have been, or properly reported, as the law requires.

44.     The risks created by the deficiencies described above were clearly preventable by the Corporate Defendants through the application of fundamental management, medical, nursing, and standard of care principles.  Through the implementation of well-recognized policies, precautions, practices, and safety measures utilized in a reasonable nursing home of ordinary prudence, Lee Witschi would have been protected from the injury, loss and damage he suffered.

45.     Each of the violations of applicable standards of care on the part of the Corporate Defendants, as documented in Paragraphs 38-42, constituted violations of the law and, therefore, constitute negligence *per se* on the part of the Corporate Defendants.  Each such violation of duty caused injury, damage, and loss to Witschi that would not have otherwise occurred.  Stated simply,

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 15

by disregarding their duties, the Corporate Defendants placed Witschi's physical and emotional health and well-being in jeopardy and in so doing, caused him actual injury, damage and loss.

### C.     Wrongful Death

46.     The allegations set forth in Paragraphs 1-45 above are incorporated herein by reference as if fully set forth.

47.     The acts of negligence described above in combination with additional, subsequent acts and omissions on the part of the Corporate Defendants, including but not limited to the medically unsupportable decision to place Witschi on hospice care, initially without authority and then without proper assessment, and without providing adequate, full, and/or accurate information to key decision makers, under circumstances that neither required nor supported hospice placement, directly and proximately led to Witschi's unnecessary and premature death in May, 2016.  The lack of appropriate care delivered during the time Witschi was on hospice care included but is not limited to a failure by the Corporate Defendants to provide proper and adequate care and treatment, nutrition, and fluids and/or to otherwise to adequately provide for his physical and emotional needs.

48.     The injuries, damage, and loss suffered by Lee Witschi, including his wrongful death while a resident of Good Samaritan Minneapolis, now being brought by Kellogg individually and as administrator of his Estate, were clearly preventable by the Corporate Defendants through the application of fundamental management, medical, nursing, and standard of care principles.  Through the implementation of well-recognized policies, precautions, practices, and safety measures utilized

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 16

in a reasonable nursing home of ordinary prudence, Lee Witschi would not have been harmed.

49.     These negligent breaches of standards of care and the resulting consequences for Witschi and Kellogg occurred without act or omission on the part of Lee Witschi or Kellogg contributing thereto.

50.     As a result of the violations of the law, negligence, and all resulting breaches of applicable standards of care by the Corporate Defendants and their employees, servants, agents, and representatives, Lee Witschi suffered conscious pain and suffering, physical and mental injury, and death.

51.     Each of the described, foregoing violations of the law, acts of negligence, and breaches of applicable standards of medical care on the part of the Corporate Defendants operating separately, or in combination, or jointly, or cumulatively, was a proximate cause of Lee Witschi's injuries, death, and damages, which are more specifically described below.

### V.     STATE OF FACTS AND CLAIMS AGAINST DEFENDANT CITY

52.     The allegations set forth in Paragraph 1-51 are hereby incorporated as if fully set forth.

### A.     Unlawful Seizure and Use of Excessive Force; Violation of 4th Amendment

53.     On or about March 29, 2016, in the late afternoon hours, unidentified officers associated with the Defendant City's Policy Department [hereinafter "Department"] were summoned to Good Samaritan Minneapolis by or at the direction of the facility's former director, Pam Black.

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 17

54.     On information and belief, there were two officers associated with the Minneapolis Police Department who became involved in the events that unfolded at the Facility with Mr. Witschi on March 29, 2016.  The first ten (10) minutes of the encounter between these officers and Witschi were not recorded with a Department body camera (or otherwise) as the body camera was inadvertently left at the station; however, there is recorded footage of the encounter consisting of around twenty-five (25) minutes after one officer retrieved the camera and began filming the officers initially cajoling and then threatening Witschi about what would happen if he did not voluntarily submit to their demand that he accompany them to the doctor.

55.     Information regarding the specifics of what the officers or others associated with the Department had been told, if anything, about the need for police involvement during the initial contacts with Black or her designee is currently unavailable to Kellogg; however, Black contacted law enforcement for the purpose of using the officers to compel Witschi, a ninety-one-year old Alzheimer's patient, to go to a doctor in Salina, after he repeatedly indicated to her that he did not want to go at that time.

56.     The officers were advised that Witschi suffered from dementia and knew or should have known that they were neither trained nor equipped to handle the situation with which they were asked to assist.

57.     These facts notwithstanding, the Defendant City's officers did not secure additional information about Witschi's physical or mental helath nor did they attempt to obtain instruction or

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 18

advice about an appropriate means for providing meaningful, effective assistance to Witschi, as an

Alzheimer's victim.

58.     There is similarly no evidence that the officers made any effort to contact Kellogg for

help in securing her father's agreement to go to the doctor or suggest that someone else do so.  Nor

is there evidence that it would have been a problem for Witschi's trip to the doctor to wait until the

following morning.  Instead, they surrounded him, first in the dining room, where he was sitting

calmly when they arrived, and later in a chair in the sitting room and repeatedly told him that he was

going to be taken to the doctor forcibly and against his will if he did not submit to their demand that

he get up from his chair and "walk" to a vehicle ready to take him to the doctor.

59.     Said officers repeatedly told Witschi that his only options for ending the seizure were

to go voluntarily with them to the doctor or to be physically forced to do so.  He was given no choice

but to comply or be taken against his will.

60.     Through these actions and others, Defendant City's officers improperly, without

justification and in violation of Witschi's Fourth Amendment rights under the United States and

Kansas Constitutions, seized Witschi by restraining his freedom of movement and preventing him

from disengagement.

61.     These officers had no reasonable basis for a belief that Witschi was engaged in

criminal activity when they confronted him or that he was about to engage in criminal activity.  He

was not a threat to them or others, and there was no reasonable or constitutional basis for detaining

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 19

him in the first instance.  He was simply not willing to go to the doctor.

62.     However, instead of disengaging, these Department officers, along with at least one

officer employed by a separate law enforcement agency, continued to threaten him verbally,

physically, and with their demeanor.

63.     Eventually, in response to a demand from one of the Department's Officers that

Witschi get up and "walk," Witschi rose from his chair in the sitting room and began to walk.  He

was almost immediately, and without prior warning, shot in the back with an Electronic Control

Device [hereinafter "EDC" or "Taser"] as he walked away.

64.     The prongs of the Taser sent electricity into the muscle fibers of Witschi's back,

causing the muscles to contract uncontrollably and immobilizing him.  Witschi collapsed to the floor,

which the officers knew or should have known would occur.  None of them had placed themselves

in a position to break his fall.  As the result of his fall, Witschi sustained injury, including but not

limited to a head injury.

65.     Thereafter, with Witschi still on the floor, these Department officers inexplicably and

with excessive, unreasonable, brutal, and unnecessary force and in further violation of Witschi's

Fourth Amendment rights, participated in physically forcing his hands behind his back and then

cuffed him, fracturing one his wrists.

66.     Although Witschi repeatedly cried out in pain from his position on the floor, the

officers refused to loosen the cuffs.  Even when it became clear from his cries for help (i.e. "Call the

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 20

police") that Witschi never understood the Department officers were the "police" in the first place, they refused to loosen the cuffs and, in fact, placed him on a gurney with his hands still secured behind his back and assisted in strapping him down.

67.     These actions of the Department's officers constituted excessive force and a violation of Witschi's Fourth Amendment rights and subjected him to and actually caused him to suffer significant injury.

**B.     Assault and Battery**

68.     The allegations set forth in Paragraph 53-67 are hereby incorporated as if fully set forth.

69.     Defendant City's officers' actions against Witschi, as described in Paragraph 53-67 above,  against Witschi constitute both assault and battery.

70.     As a direct and proximate result of said assault and battery, Witschi sustained physical and emotional injury, damage, and loss.

WHEREFORE, for the reasons set forth in this Complaint, Kellogg prays for judgment in her favor and for compensatory and other allowable damages against the Corporate Defendants and the City, an award of her costs, interest, expert and attorney fees for this action against the City as allowed by law pursuant to 42 U.S.C. §1988 and other relevant statutes; and for such other and further relief as the Court deems just and proper under the circumstances.

United States District Court for the District of Kansas
*Kellogg v. Good Samaritan Society, Inc. et. al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Case No.* _____
Page 21

## DEMAND FOR TRIAL BY JURY

Plaintiff expressly requests that all issues of fact triable as a matter of right under the Seventh Amendment to the United States Constitution be tried to a jury.

*/s/ Debra Egli James* _____
Debra Egli James

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas, as the place for trial in this matter.

*/s/ Debra Egli James* _____
Debra Egli James

Respectfully submitted,

*/s/ Debra Egli James* _____
Debra Egli James
Kansas Supreme Court  No. 12979
Attorneys for Plaintiff
HAMPTON & ROYCE, L.C.
United Building, Ninth Floor
119 West Iron Avenue
P. O. Box 1247
Salina, Kansas 67402-1247
Telephone: (785) 827-7251
Facsimile:  (785) 827-2815
E-mail:  debjames@hamptonlaw.com

United States District Court for the District of Kansas
*Kellogg v. The Evangelical Lutheran Good Samaritan Society, et. al.* . . . . . . . . . . . *Case No.* _____
Page 22

# VERIFICATION

State of Kansas          )
                         ) ss:
County of Saline         )

I, Carol A. Kellogg, of lawful age, being first duly sworn, state that I am the Complainant in

the above entitled action, and that I have read the foregoing Complaint and know the contents thereof

and the same is true to my own knowledge.

_____
Carol A. Kellogg

Subscribed and sworn this 26th day of February, 2018.

_____
Notary Public

My appointment expires:

1-11-21