# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CAROL A. KELLOGG, Individually, and
as sole Heir-at-Law and Administrator
of the Estate of Lee J. Witschi, deceased,
      Plaintiff,

vs.                              No. 18-1061-JTM

KEITH COLEMAN, Sheriff of Ottawa
County, Kansas, *et al.*,
      Defendants.

## MEMORANDUM AND ORDER

On March 29, 2016, two officers of the Minneapolis, Kansas police department responded to a call from a local nursing home indicating that one elderly patient, Lee Witschi, had assaulted another. The nursing home staff asked the officers to transport Witschi to a hospital for mental evaluation. Witschi refused, and was subsequently tasered by an Ottawa County undersheriff what had arrived to assist. Witschi's heir instituted this action for violation of his constitutional rights, and the matter is before the court on the defendants' Motions to Dismiss. For the reasons provided herein, the court finds these motions should be granted.

The operative Third Amended Complaint alleges that The Evangelical Lutheran Good Samaritan Society is a 64-bed nursing facility located in Minneapolis, Kansas. It gives skilled nursing care and special mental health services to residents that are experiencing functional impairments.

After a four-day hospitalization in November, 2013, Lee Witschi was admitted to Good Samaritan for evaluation. Witschi otherwise appeared healthy and had not been under a doctor's care for some thirty years, but his daughter Kellogg had begun to notice behavioral changes, memory loss, and other symptoms of possible dementia. A physician diagnosed Witschi as having "'slowly progressive dementia' of likely Alzheimer's type or 'other behavioral dementia known to have behavioral disturbances as a feature of the disease.'" (Dkt. 57, ¶ 55).

Witschi was admitted to Good Samaritan's memory care unit, known as "the Cove," that specialized in personalized care for residents with memory issues and other special needs. According to the Third Amended Complaint, Witschi's physician described him as "very healthy, grossly oriented to person, place and time; hard of hearing and easily confused [and] prescribed Namenda, a prescription drug often used with Alzheimer's patients." (Dkt. 57, ¶ 60).

On March 29, 2016, the staff at Good Samaritan called Minneapolis police, asking for their help in transporting Witschi to the Salina Regional Health Center for an evaluation. The staff reported that Witschi "had been in a confrontation with another nursing home resident earlier that day and [they] needed assistance to get Lee Witschi" into a van "so that he could be transported to Salina Regional Health Center." The general nature of the call was then reported to Minneapolis police officers Gent and Carr. The Complaint alleges that at the nursing home, the staff did not tell Gent and Carr "about the specifics of the confrontation," but the officers were "told that Lee Witschi was in his

90s and did have Alzheimer's." (Dkt. 57, at 68-70). The earlier 911 call from Good Samaritan (which is included in the record) was more specific, reporting that "we have a resident who needs to go to the ER for, basically, he was beating the crap out of another resident," "we've got to keep our residents safe," and "we can't have him here like this."

Gent and Carr found Witschi in the dining room, "displaying a calm demeanor." (*Id*. ¶ 71). Gent and Carr repeatedly tried to get Witschi to accompany them to the nursing home's van, so that he could be transported to the hospital. Witschi refused.

The nursing home staff insisted that transportation was necessary. Gent radioed for assistance, and Deputy Russell Thornton arrived within a few minutes.

In the interim, Witschi walked from the dining room to the living room to watch television. Thornton repeatedly tried to persuade Witschi go to the van. During this time, the staff continued to insist to the officers that Witschi had to be transported for evaluation.

Gent told the staff that the officers did not want to place their hands on Witschi, but that that might be only way to get him to the van. All three officers repeatedly asked Witschi to stand up.

Eventually, Witschi told the officers to back up. He then stood up and walked past the officers. While Witschi was walking away, Thornton pulled his taser and used it on Witschi, who fell to the ground.

Witschi died May 19, 2016. The Complaint alleges that Good Samaritan caused his death (Dkt. 57, ¶¶ 3 ,212), but makes no allegation that the death was caused by the City or the County as a result of the tasing incident.

Kellogg filed a Notice of Claim with the City on September 7, 2017. Kellogg stated that she had video of the events and identified Gent and Carr by name.

Kellogg initiated the present action by filing a series of complaints which were amended in quick succession. The original Complaint in this action was filed on February 27, 2018, followed by a First Amended Complaint on March 29, 2018, and a Second Amended Complaint on May 24, 2018. These complaints did not name any individual defendant in an individual capacity.

After the defendants responded by filing motions to dismiss which included defenses that the named defendants were not proper parties to the action, Kellogg sought leave to amend yet again. The court granted the relief sought, and Kellogg filed the Third Amended Complaint on November 2, 2018. The Third Amended Complaint raises individual capacity claims against Gent and Carr for unlawful seizure and excessive force, and against the City for failing to employ policies or training which would have prevented the incident.

According to an affidavit by Carr, he had no knowledge of the case until he was served with the Third Amended Complaint on December 10, 2018.

**Individual Defendants and the Statute of Limitations**

Both the County and the City seek dismissal of the claims against the individual officers, because these claims were added only in the Third Amended Complaint and are accordingly time barred. The plaintiff argues that these claims relate to the earlier claims against the corporate defendants, and are therefore timely. The court first considers the timeliness of the claims against the County officers.

An amendment adding a party will relate back to an earlier pleading if "the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15 (c)(1)(C).

In applying the Rule, the court "asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski v. Costa Crociere S. p.A.*, 560 U.S. 538, 548 (2010) (emphasis in original). In *Krupski*, the plaintiff injured on a cruise ship had originally sued the operator of the cruise (Costa Cruise Lines) rather than the Italian Corporation which owned the ship (Costa Crociere). The Court of Appeals had affirmed the district court's decision that the plaintiff's subsequent amendment could not relate back, because "Krupski knew or should have known of the proper party's identity and thus determined that she had made a deliberate choice instead of a mistake in not

5

naming Costa Crociere as a party in her original pleading." *Id. The* Supreme Court held

this was "the wrong starting point," explaining:

> Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity. For purposes of that inquiry, it would be error to conflate knowledge of a party's existence with the absence of mistake. A mistake is "[a]n error, misconception, or misunderstanding; an erroneous belief." Black's Law Dictionary 1092 (9th ed.2009); see also Webster's Third New International Dictionary 1446 (2002) (defining "mistake" as "a misunderstanding of the meaning or implication of something"; "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention"; "an erroneous belief"; or "a state of mind not in accordance with the facts"). That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. A plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim. If the plaintiff sues party B instead of party A under these circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties. The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.

> Respondent urges that the key issue under Rule 15(c)(1)(C)(ii) is whether the plaintiff made a deliberate choice to sue one party over another. We agree that making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity. We disagree, however, with respondent's position that any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one, the proper defendant could reasonably believe that the plaintiff made no mistake. The reasonableness of the mistake is not itself at issue. As noted, a plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that

misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.

560 U.S. at 548–49 (record citations omitted).

The plaintiff relies in particular on *Krupski*, and argues that the officers should have known that they were omitted from the earlier complaints by mistake. In contrast, citing the September 7, 2017 notice of claim letter, which explains in detail the actions of various officers at the scene, the County argues Kellogg made a deliberate choice not to sue Thornton or Coleman as individual individuals. (Dkt. 84, at 7-8). The County argues that further support for this conclusion is reflected in the *Krupski* Court's treatment of its earlier decision in *Nelson v. Adams, USA, Inc.*, 529 U.S. 460 (2000). The Court concluded that *Nelson* was "entirely consistent with our understanding of the Rule: When the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." 560 U.S. at 552.

Here, it is clear that Kellogg knew of the individual defendants' existence. Having possession of video evidence, she knew in detail the identities and actions of the officers at the scene. This is not a case, as in *Krupski*, where the plaintiff knew of two virtually identically named corporate entities, and erred as to which was responsible for operation of the cruise ship. Rather, plaintiff made a deliberate, tactical decision not to sue the individual officers. The plaintiff knew the County and City were acting through their

officers, as reflected in the First Amended Complaint which asserts claims against both based on the "actions [of] the officers associated with them" (Dkt. 7, ¶ 62) — yet nevertheless deliberately avoiding any hint of action against the officers themselves.

The plaintiff was factually "fully informed" as to the identities of the officers involved, but deliberately chose to sue only the corporate defendants, likely as a means of avoiding qualified immunity issues. The plaintiff's tactical maneuvering is not the same as a mistake of fact as to the proper party to be sued. This court has repeatedly addressed the relation back issue under Rule 15(c) since *Krupski* was decided, and has still considered whether plaintiff's initial failure to name the correct defendants was due to mistake. *See Burns v. Transdigm Grp., Inc.*, No. 13-1371-RDR, 2015 WL 2062925, at *1, *6 (D. Kan. May 4, 2015), *Price v. City of Wichita*, No. 12-1432-CM-DJW, 2014 WL 289453, at *1, *8 (D. Kan. Jan. 27, 2014).

This court has determined that a party who is fully informed as the actions of the defendants but sues the wrong party as the result of a legal error in strategy cannot take advantage of Rule 15(c). Thus, in *McGregor v. Shane's Bail Bonds*, No. 10-2099-JWL, 2010 WL 3155635, at *1 *7 (D. Kan. Aug. 9, 2010), the court observed:

> Here, the record shows that plaintiff named "Shane's Bail Bonds" rather than Aarecorp despite having full knowledge of the existence of Aarecorp and its role in the events giving rise to plaintiff's claims. Similarly, plaintiff failed to name Mr. Rolf as a defendant even though she had been made aware in the state court litigation of his existence and potential liability. In response to defendants' arguments, plaintiff states that she believed she had to name the parties in the same manner as she did in the state court action to take advantage of the Kansas Savings Statute. Plaintiff may have made a legal error concerning the application of the Kansas Savings Statute and

Rule 15(c), but she cannot be said to have made a mistake about the identities of Aarecorp or Mr. Rolf when she deliberately chose to instead name "Shane's Bail Bonds" in her federal court complaint. *See Wandry* [*v. Service Bus. Forms*], 762 F.Supp. [299,] 302 [(D. Kan. 1991)] ("where the plaintiff knows the identity of the proper parties within the statutory period, the plaintiff's failure to name these parties represents only a tactical mistake, and there is no mistake in identity of which the defendant might have knowledge").

The district court's decision was affirmed on the merits by the Tenth Circuit, which indicated plaintiff "was unquestionably aware of the identity and involvement of Johnson County law enforcement" at the time of the incident. *McGregor v. Snyder*, 427 F3d.Appx. 629, 232 (10th Cir. 2011). The court rejected plaintiff's argument on appeal relating to the legal capacity of the defendants, observing plaintiff failed to "explain[] any error in the district court's decision" on the limitations issue — which would include the observation that legal error or tactical mistakes cannot support relation back. *Id*.

This court reached a similar conclusion in *Grider v. Shawnee Mission Med. Ctr., Inc.*, No. 16-2750- GLR, 2017 WL 2971967, at *4 (D. Kan. July 12, 2017), *reconsideration denied*, No. 16-2750- GLR, 2017 WL 4099470 (D. Kan. Sept. 15, 2017), where the plaintiffs alleging medical malpractice sought to amend their complaint against a hospital to add a claim against an individual physician employee of the hospital. The plaintiffs argued the amended complaint would relate back because "they made a mistake about the difference in *legal* status of Dr. Piquard and her employer." *Id*. at *4 (emphasis in original). The court held that the new claim was time-barred:

> The Court finds Plaintiffs' conduct compels the conclusion that their failure to name Dr. Piquard *as a defendant* in the original Complaint was not a

mistake. Plaintiffs knew Dr. Piquard's role and her existence from this case's inception. Yet, over the course of five months, they twice amended their Complaint without naming Dr. Piquard as a defendant. Their delay in seeking to add Dr. Piquard, moreover, exceeds the 90-day timeframe set forth in Federal Rule of Civil Procedure 4(m). This conduct favors a finding that Plaintiffs made a tactical decision, rather than a mistake. It is a common assumption that a bigger payday may be had by suing a corporation rather than its employees, because the corporation apparently has more financial resources. The Court also finds it hard to believe that a plaintiff could reasonably mistake the legal identities of a corporation and a living human being, particularly when that plaintiff knew of the existence and role of each. Indeed, unlike *Krupski*, Plaintiffs have not confused two entities with similar names, either corporate or individual, with very similar names

*Id.* at *4 (footnotes omitted, emphasis in original). *See also Sweet v. Audubon Fin. Bur.*, 2016 WL 9777177, *4 (D.N.M June 27, 2016) (reversing Magistrate Judge decision allowing relation back, where evidence showed defendant "would have suspected that Plaintiffs simply made a tactical decision to sue DMP—the corporation he co-owned and co-managed—instead of suing him directly"). *Cf. Coleman v. Marriott Int'l, Inc.*, No. No. 16-1343-JTM-TJJ, 2017 WL 957446, at *3 (D. Kan. Mar. 13, 2017) (allowing relation back where there was "[n]o evidence … suggesting that Plaintiff's counsel knew about True North and made a tactical decision not to name it as a defendant when she initially filed her petition").

As in *Grider*, the plaintiff here knew everything about the individual defendants' actions from the inception of the case. And, again as in *Grider*, the case does not involve any confusion of similarly-named entities. Plaintiff's pattern of pleading across *three* separate complaints without raising any individual claims against individual defendants

shows a conscious tactical decision to sue only corporate governmental defendants. "The *Krupski* decision does not eliminate Rule 15(c)(1)(C)'s requirement that a mistake be the reason for failing to properly name defendants prior to the expiration of the statute of limitations." *Silva v. Ekis*, No. 15-3007, 2018 WL 1456523, at *3 (D. Kan. Mar. 23, 2018). Accordingly, the court dismisses any claims advanced against individual County officers.

The court reaches the same conclusion as to the claims against the two City officers. The issues relating to these officers are identical, and make both the same arguments relating to the statute of limitations. The City also note the existence of additional Tenth Circuit authority, *Bell v. City of Topeka*, 279 F. App'x 689, 692 (10th Cir. 2008). In that case the court held that relation back was not appropriate where a plaintiff has originally named a John Doe defendant and subsequently sought leave to amend to specify an actual individual, because a "'plaintiff's designation of an unknown defendant ... in the original complaint is not a formal defect of the type [the rule] was meant to address.'" *Id*. at 692 (10th Cir. 2008) (quoting *Garrett v. Fleming*, 362 F.3d 692, 696 (10th Cir. 2004)). The court finds that individual claims against Officers Gent and Car should be dismissed.

**The Municipal Defendants**

The Third Amended Complaint seeks to independently impose liability on the County defendants and the City by arguing that they failed to properly train their officers at the scene. The County and City raise similar arguments in support of dismissal — first

that there was no underlying violation, and that the failure-to-train claims are formulaic and conclusory. In addition, the County defendants argue that only the Sheriff is a proper defendant for such a claim, as only he has policy-making authority for his department, and he is protected by Eleventh Amendment immunity.

The court first addresses the issue of whether a constitutional violation occurred. The defendants argue that no violation occurred by incorporating their qualified immunity arguments, originally made in support of dismissing the individual defendants.

To defeat qualified immunity, a plaintiff faces a "heavy two-part burden" of showing both that (1) the defendants violated a constitutional right, and (2) the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." *Martinez v. Carr*, 479 F.3d 1292, 1294-95 (10th Cir.2007). With respect to claims of excessive force, courts will determine whether a constitutional violation exists by considering "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[1]

---

[1] The County argues the *Graham* factors are "ill-fitting" because officers were exercising their community caretaking function after being called to the nursing home after an alleged battery, the *Graham* factors being more appropriate for "run-of-the-mill cases where an officer is accused of using physical force during a resisting suspect's arrest," and that the relevant inquiry here should reflect "the broader mosaic, often

Whether qualified immunity is appropriate "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conn*or, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "The inquiry assesses 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396).

"At qualified immunity's second step, *Graham* cautions us to proceed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking account of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Wilson v. City of Lafayette*, 510 F. App'x 775, 779 (10th Cir. 2013) (quoting *Graham*, 490 U.S. at 396–97). To show a right is clearly established, the plaintiff must point "to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). The law is clearly established if "every

---

referred to as the totality of the circumstances." (Dkt. 84, at 11). The court finds the distinction unpersuasive. Courts typically consider *Graham* within the context of all the circumstances of the case. *See Wilson*, 510 Fed.Appx. at 778 (deciding issue of qualified immunity based on "the application of these so-called Graham factors and looking to the totality of the circumstances"). More to the point, if anything, the fact that the defendants support their conduct by identifying the civil commitment statute and the community caretaking function only underlines the *reduced* need for dangerous physical force to subdue Witschi.

reasonable official would have understood that what he" did violated the law. *Ashcroft v. al-Kidd*, ––– U.S. –––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).

In determining whether a right is clearly established, the Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). "Although [the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks and citation omitted). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir.2007).

"If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Kent v. Oakland County*, 810 F.3d 384, 396 (6th Cir. 2016) (quoting *Hagans v. Franklin Cty. Sherriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012)).

The County argues that Thornton's actions were reasonable because he was acting under the community caretaking function to protect a citizen (Dkt. 69, at 14), citing *Arden v. McIntosh*, 622 F.Appx. 707, 709 (10th Cir. 2015), and K.S.A. 59-2593, which provides that "any law enforcement officer who has a reasonable belief formed upon investigation that

a person is a mentally ill person and because of such person's mental illness is likely to

cause harm to self or others if allowed to remain at liberty may

take the person into custody without a warrant." It further argues that the use of force

must be viewed with the understanding that officers are "forced to make a split-second

judgment in circumstances that are tense, uncertain, and rapid evolving" (Dkt. 69, at 15).

The County in its reply discusses the details of the staff's 911 call, and argues there were

"few good options" for dealing with Witschi. (Dkt. 84, at 12).

The court finds that Undersheriff Thornton's actions were unreasonable. The

community caretaking function[2] and the Kansas statute might authorize the defendants

---

[2] The County cites (Dkt. 84, at 13, 14) *Stanley v. City of Baytown*, 2005 WL 2757370 (S.D. Tex. 2005) as support for tis contention that "the use of a Taser on a mentally unstable person" may not be unreasonable for officers engaged in the community caretaking function. *Stanley* bears little resemblance to the present case. The officer there employed the taser after arriving at the scene to find EMT's struggle with a "violent" "kicking," "muscular" man they were trying to treat in their ambulance. *Id*. at *3.

> When [Officer] Elizondo confronted Plaintiff inside the ambulance, according to the uncontroverted summary judgment evidence, Plaintiff was a volatile and very muscular man who was on a cycle of steroids; Plaintiff was dressed only in boxer shorts and was sweating profusely, making it difficult to grasp or hold him; Plaintiff was resisting the efforts of the EMTs and at least two firemen to restrain him physically and he was making movements sufficiently forceful and severe to cause the EMTs to abandon their attempts to provide medical treatment because of fear for their own safety; and Plaintiff was unresponsive to the EMTs' verbal pleas and may not have been "fully functioning mentally at this point." Before using the Taser, Elizondo spent three to five minutes using verbal control tactics in an unsuccessful effort to calm Plaintiff down, after which Elizondo's only use of force consisted of a one to two second tase that inflicted no serious injury upon Plaintiff.

*Id*. at *7. The officer explicitly warned the Plaintiff he would use a taser and he would be "contacted with 50,000 volts of electricity." *Id*. at *3. Here, according to the Complaint, Thornton

to detain Witschi, but they do not establish that they were free to do so by whatever force they chose. In the present case, there was no "split-second judgment" required under "rapidly-evolving circumstances." Application of the *Graham* factors to the totality of the circumstances of the case supports the conclusion that the tasing was an unreasonable use of force.

There was no need for rapid resolution of the dispute. The 91-year-old Witschi presented no threat to the officers, and the Third Amended Complaint includes the statement of a nurse at the scene that Witschi was no threat to anyone when the officers arrived and found him in the dining room. The Complaint further alleges that the officers were not told of the details of the Witschi's prior confrontation with the other nursing home resident. And it cannot seriously be maintained that the officers reasonably believed that the elderly nursing home patient might escape from them.

In arguing that the law governing the of a taser was clearly established, Kellogg cites to *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010), where the court held that qualified immunity did not apply in the case of a police officer who had used a taser without warning on the plaintiff, which resulted in a traumatic brain injury when the plaintiff fell and struck her head.

In *Cavanaugh*, the officer was responding to a "non-emergency call" by plaintiff's husband of a "domestic dispute." When the defendant officer arrived, the husband stated

---

without warning deployed a taser on a frail, elderly nursing home patient, where there was no immediate threat to any persons, and which resulted in a head injury.

that the plaintiff had earlier in the evening "attempted to put him in a closet." 625 F.3d at 662. The court observed that even if this allegation was true, it would reflect a noninjurious assault, a class B misdemeanor under Utah law.

Further, the court observed, the evidence showed that the plaintiff

> did not pose an immediate threat to Officer Davis or anyone else at the scene. Moments before Ms. Cavanaugh was Tasered, she and Officer Davis passed within a few feet of each other as she made a beeline to her front door. She did not act aggressively towards Officer Davis or threaten him. Her clearly visible hands contained no knife or other weapon, and Officer Davis followed her at a distance of six feet. The Taser's probes struck Ms. Cavanaugh before she opened the door to her home, and before Officer Davis so much as uttered a warning. Besides Mr. Murphy — who was standing on the driveway to his adjacent home — no bystanders were present outside the home. These facts certainly could lead a reasonable jury to conclude that Ms. Cavanaugh did not pose an immediate threat to Officer Davis or anyone else at the scene.

> [Moreover], again relying upon the eyewitness testimony of Mr. Murphy, when the Taser was deployed Ms. Cavanaugh was neither actively resisting nor fleeing arrest. In fact, a reasonable jury could conclude that Ms. Cavanaugh had no reason to suspect that she was under arrest until after she was Tasered — Officer Davis gave her no verbal commands and she had little reason to believe that the officers were responding to a crime.

In reaching the conclusion that the defendant in that case had violated clearly established law, the court also cited its earlier decision in *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir.2007), where "we faced very similar factual circumstances: a police officer used her Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." 625 F.3d at 666 (citing *Casey*, 509 F.3d at 1281-82).

The County attempts to distinguish *Cavanaugh* because it did not involve the community care-taking function or a state civil commitment statute; and the court addressed the validity of the use of force by reference to the factors set forth in *Graham v. Connor.* 625 F.3d at 665-66, citing *Graham*, 490 U.S. 386 (1989).

However, there remain substantial similarities. In *Cavanaugh* and in this case the officers were presented with a non-emergency situation. Although there is some indication that Witschi had previously battered another resident, the Complaint alleges that this information was not conveyed to the officers at the scene. There is no indication that the alleged battery resulted in any substantial injury, and the County makes no allegation that Witschi actually committed any crime — relying instead on the community caretaking function and the Kansas commitment statute as grounds for detaining Witschi. When challenged by the nursing home staff after the tasing, rather than invoking any need for dealing with a dangerous suspect, the officers laconically announced that they were acting out of "protocol."

The officers were not dealing with a serious crime, and were not called to the scene when the police reported that those officers needed assistance. Even if, as plaintiff stresses, Witschi was not formally placed under arrest, the officers were entitled to detain him. However, they were not entitled to use force wildly disproportionate to the circumstances.

"When a suspect actively resists arrest, the police can use a taser to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Saunders v.*

*Cuyahoga Met. Housing Auth.* 2019 WL 1777223, at *6 (6th Cir. Apr. 23, 2019) (internal quotations and alteration omitted) (denying qualified immunity and finding law clearly established, where officer used taser on nonfleeing, nonthreatening subject of noise complaint).

The court finds that qualified immunity would not shield Undersheriff Thornton, and that Third Amended Complaint asserts a constitutional violation, as the employment of such force under such circumstances might reflect a violation of Witschi's constitutional rights, such rights being clearly established under the law. Accordingly, the court concludes that plaintiff has alleged a constitutional violation occurred, and will (later in the present opinion) address the County defendants' other defenses to municipal liability.

The court finds, however, that the plaintiff has failed to demonstrate any underlying constitutional violation with respect to the City. When Undersheriff Thornton used his taser to restrain Witschi, Gent and Carr were simply present at the scene. Accordingly, the central allegation against these officers is that they failed to prevent the Thornton's use of the taser. Where a plaintiff alleges police officers violated his rights by failing to intervene against another officer, "the officers must have observed or had reason to know of a constitutional violation and have had a realistic opportunity to intervene." *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (internal quotations omitted).

Here, the Third Amended Complaint contradicts the idea that Gent and Carr had a realistic opportunity to intervene to stop the tasing. The Complaint actually emphasizes

the suddenness of Thornton's actions, stating that when Witschi stood "and walked passed [sic] the officers" the undersheriff "pulled his taser gun, yelled 'taser,' and shot Lee Witschi in the back." (Dkt. 57, at 82). The use of the taser occurred "with no warning." (*Id*. at 113(a)).

In responding to the City's Motion to Dismiss, the plaintiff asserts that Amended Complaint merely alleged that there was no warning *to Witschi*, not that there was no warning at all. But that misstates the actual language of the Complaint—there, the plaintiff states explicitly that Thornton's used of the taser was both "inexplicabl[e]" and given "with no warning on March 29, 2016." There was no warning on the day in question, to any person. The plaintiff's response indeed further concedes the abruptness of Thornton's action, stating at another point that "the video of the March 29 Incident shows that Defendant Thornton yelled, ''tase!' *just before firing the taser*." (Dkt. 80, at 24) (emphasis added).

Piling speculation on speculation, plaintiff asserts that "it is very possible" discovery will indicate that the police officers should have "anticipated or [seen as] possible" Thornton's use of the taser. (*Id*. at 23-24). But the court must determine the viability of the Third Amended Complaint based on its sworn allegations, not subsequent argument. And the Complaint itself makes no allegation of a realistic opportunity for the police officers to thwart Thornton. Rather, the Complaint emphasizes there was no warning on the day of the incident.

Accordingly, the court finds that plaintiff has failed to allege a realistic opportunity by Gent and Carr to prevent the tasing. Because there was no constitutional violation, and derivative failure-to-train claims against the City should also be dismissed.

Undersheriff Thornton's actions, as noted earlier, do reflect a potential constitutional violation, but the court need not address the County's argument that plaintiff's failure-to-train claim is simply too ambiguous and generic to remain viable, because the court agrees that the only proper party to such a claim is Sheriff Thornton, and the Sheriff enjoys Eleventh Amendment immunity.

Both the Tenth Circuit and this court have determined that Kansas Sheriffs are protected by the Eleventh Amendment. *See Hunter v. Young*, 238 F. App'x 336, 338 (10th Cir. 2007); *Self v. Cnty. of Greenwood*, No. 12-1317-JTM, 2013 WL 615652, at *2 (D. Kan. Feb. 19, 2013). The plaintiff urges a different result, based on the application of the four factors relevant to determine whether a given governmental subdivision is an "arm of the statute" for Eleventh Amendment purposes, as identified in *Steadfast Insurance v. Agricultural Insurance*, 507 F.3d 1250 (10th Cir. 2007), factors which were in turn derived from the Supreme Court's decision in *Mt. Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977).

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds

or levy taxes on its own behalf. Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

507 F.3d at 1253 (citations omitted).

The court finds that application of the *Steadfast* factors do not provide any reason for departing from the earlier decision by the undersigned in *Self* or by the Tenth Circuit in *Hunter*. This conclusion finds further support in other decisions of this court, finding that, as to claims arising from their law enforcement function, sheriffs are entitled to immunity. *See Myers v. Brewer*, No. 17-2682-CM, 2018 WL 3145401, at *1–2 (D. Kan. June 27, 2018); *Broyles v. Marks*, No. 18-3030-SAC, 2018 WL 2321822, at *4 (D. Kan. May 22, 2018); *Brown v. Kochanowski*, No. 07-3062-SAC, 2012 WL 4127959, at *9 n.3 (D. Kan. Sept. 19, 2012), *aff'd*, 513 F. App'x. 715 (10th Cir. 2013).[3]

With respect to the status of a sheriff under state law, the Kansas Supreme Court has unambiguously determined that they are state officers.

> The sheriff is an independently elected officer whose office, duties, and authorities are established and delegated by the legislature. The sheriff is not a subordinate of the board of county commissioners and neither are the undersheriff or the sheriff's deputies and assistants. Rather, the sheriff is a state officer whose duties, powers, and obligations derive directly from the legislature and are coextensive with the county board. The undersheriff and the sheriff's deputies and assistants are subordinates of the office of sheriff. The board of county commissioners is the means by which the legislature

---

[3] Some courts have determined that Kansas sheriffs lack immunity for claims arising from their operation of the county jail. *See Trujillo v. City of Newton*, No. 12-2380-JAR, 2013 WL 535747, at *10 (D. Kan. Feb. 12, 2013) (allegation of improper strip search); *Reyes v. Bd. of Com'rs of Sedgwick Cty.*, No. 07-2193-KHV, 2008 WL 2704160, *8-9) (D. Kan. July 3, 2008) (finding no immunity as to setting jail policies). Only one court has concluded, recently, that Kansas sheriffs lack immunity when performing general law enforcement duties. *See Estate of Holmes v. Somers*, No. 18-1221-JWB, 2019 WL 1670796 at 14 (D. Kan. April 17, 2019).

finances the operation of the office of the sheriff. The board of county commissioners is not free to usurp the powers of the office of sheriff by controlling the hiring or firing of the deputies and assistants appointed by the sheriff.

*Bd. of Cty. Comm'rs v. Nielander*, 275 Kan. 62 P.3d 247, 261-62 (2003).

Kansas sheriffs primarily serve a law enforcement function, similar to those provided by the Kansas Highway Patrol, who are protected by the Eleventh Amendment.

*See Vasquez v. Lewis*, Case No. 12-4021, 2013 WL 118442, at *2 (D. Kan. Jan. 9, 2013).

The office of Sheriff is mandated by K.S.A. 19-801a, and must

keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they, and every coroner, may call to their aid such person or persons of their county as they may deem necessary.

K.S.A. 19-813.

The remaining factors are insufficient to overcome this strong support for immunity. Although Kansas counties provide funding for sheriffs, the same is true of county attorneys — and the Tenth Circuit has unequivocally determined that Kansas county attorneys are protected by the Eleventh Amendment. *See Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic*, 582 F.3d 1155, 1164 (10th Cir. 2009). The court finds no reason to depart from the earlier decision by the undersigned in *Self*, or to avoid the application of the decision of the Tenth Circuit in *Hunter* simply because it was unpublished.

In summary, the court finds that the individual claims against Thornton, Gant, and Carr should be dismissed as time-barred. The claims against the City are dismissed because no underlying constitutional violation occurred. The claims against the County defendants are dismissed because only the Sheriff is a proper party to such action and, while the deployment of the taser did constitute a potential constitutional violation, any action against the Sheriff is precluded by the Eleventh Amendment.

IT IS ACCORDINGLY ORDERED this day of May, 2019, that the defendants'

Motions to Dismiss (Dkt. 68, 75) are hereby granted.




<u>s/ J. Thomas Marten</u>
J. Thomas Marten, Judge